UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| In re Lawrence Goldstein,<br><br>　　　　　Debtor.<br>------------------------------------------------------<br>Greater Rockford Auto Auction, Inc.,<br><br>　　　　　Plaintiff,<br>v.<br><br>Lawrence Goldstein,<br><br>　　　　　Defendant – Debtor. | Bankruptcy No.  09-B-70040<br>Adversary No. 09-A-96105<br>Chapter 7<br>Judge Manuel Barbosa |

## MEMORANDUM OPINION

This matter comes before the Court on the Plaintiff's Adversary Complaint seeking to find a debt nondischargeable under 11 U.S.C. § 523(a)(2)(A). For the reasons set forth herein, the Court will enter judgment in favor of the Defendant.

## JURISDICTION AND PROCEDURE

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## FACTS AND BACKGROUND

The following facts and procedural history are taken from the Plaintiff's Complaint, the

Defendant's Answer to Complaint, and from the testimony and evidence presented and admitted at the trial held on September 21, 2010.

The Plaintiff, Greater Rockford Auto Auction, Inc., runs an automobile auction, acting as an intermediary to sell used automobiles from automobile owners to auto dealers, who further resell the cars to consumers. All of the purchasers at the auctions, which are held weekly, are licensed automobile dealers, one of whom was the Defendant, Lawrence Goldstein, who did business as Largo Automobiles, an unincorporated sole proprietorship. Mr. Goldstein was a long-time customer at the auctions, which he had attended regularly since the fall of 2005. For example, in 2007, he purchased over $1,000,000 in automobiles through Greater Rockford. He would often attend the auctions weekly, and sometimes even bought vehicles from or through Greater Rockford in between the public auction dates. At least until 2008, he never failed to pay for the cars he purchased.

When Greater Rockford held an auction, it sold each car to the highest bidder, and the purchaser could take possession that day at the end of the auction. However, as a general rule, Greater Rockford did not require payment until 7 days after the sale, which was common in the industry. It would hold the certificate of title until it received payment, at which point it would deliver the certificate of title to the purchaser. Sometimes Greater Rockford itself did not have the certificate of title at the time of the auction. This usually occurred when the seller required payment before it would release its certificate of title, and was common when the seller had to pay off a lien. In these cases, Greater Rockford would pay the purchase price to the seller in anticipation of being later reimbursed by the auction purchaser.

Sometimes, Greater Rockford deviated from its general 7-day rule. It extended the payment due date for as long as 30 or more days after sale for long-time and valued customers with good track records. As of the beginning of 2008, Greater Rockford considered Mr. Goldstein such a long-time and valued customer, and it was not unusual for the auction to allow him to have outstanding accounts receivable up to 30 days old. In April 2008, however, Mr. Goldstein had a couple of vehicle accounts that were closer to 60 days old, prompting the auction to contact him. As of April 8, 2008, there were two account receivables aged 69 days old, five that were 34 days old, and the remainder were less than 30 days old. Greater Rockford's sales manager, Chad Anderson, called Mr. Goldstein about the outstanding accounts, and Mr. Goldstein agreed to come to Greater Rockford's office. On or about April 8, 2008, Mr. Goldstein came into the office and agreed to pay for 9 of the outstanding vehicles with a personal check for $48,525.00, and apparently promised to bring in more money soon. A week later, on or about April 16, 2008, Mr. Goldstein came back into the office and paid off an additional eight vehicles with another personal check for $54,645.00.

It was not unusual for Mr. Goldstein to pay with a personal check, nor were the amounts of the two checks outside of the range of his usual payments to Greater Rockford. Neither payment was a payment in full of all outstanding accounts receivable, but Greater Rockford appeared to be satisfied as of that date. It is unclear what methodology the parties agreed on in applying the payment to outstanding vehicles. It was not based solely on age. For example, neither check was applied to one of the 69-day old vehicles, which was ultimately never paid. Most of the 34-day old receivables were paid with the first check, but one 34-day old receivable and a 27-day old receivable were not paid until the second check, while several 13-day old receivables were paid with the first

check. Nor did there seem to be a selection based on receivable amount. For both of the checks, there was a wide distribution of prices for the vehicles it was applied to, ranging between around $3,000 and $15,000, and the same was true for the vehicles for which payment was never tendered.

Based on Greater Rockford's testimony and records, it endorsed and deposited the April 8th check on April 14, 2008, and endorsed and deposited the April 16th check on April 21, 2008. Sometime after April 21, 2008, Greater Rockford received a call from its bank, indicating that the April 8th check had been returned for insufficient funds. Mr. Anderson at Greater Rockford immediately called Mr. Goldstein about the returned check. Mr. Goldstein initially said it must have been a problem at the bank, since he had just spoken with his wife, who took care of his finances, and that there should have been enough funds at the bank. This did not seem to be the case, however. After some further communication, the office manager and sales manager at Greater Rockford went to the lot at Mr. Goldstein's dealership, and he gave them the keys and titles to the unpaid cars he still had on the lot.[1] However, as of the time of the visit, eight of the cars paid for with returned checks were not there, and Greater Rockford was never able to recover them. Mr. Goldstein indicated that he had already sold those eight cars, but did not repay Greater Rockford for the missing cars, out of the sale proceeds or otherwise. Greater Rockford was able to resell the nine cars they repossessed, but claims it lost a total of $64,190.00 for the cars it could not repossess together with losses in reselling the cars for a lower price.

---

[1] It is unclear from the testimony and evidence presented whether this visit occurred before or after the second check was returned, and whether they went to the lot to retrieve cars a single time or twice.

## DISCUSSION

### A.     Standard for Section 523(a)(2)(A)

Section 523(a)(2)(A) provides a limited exception to the dischargeability for individual debtors for any debt:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by–
>
> (A)     false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition....

11 U.S.C.A. § 523(a)(2) (West 2010). The party opposing discharge bears the burden of proving by a preponderance of the evidence that the debt falls within the ambit of Section 523(a)(2). In re Morris, 223 F.3d 548, 552 (7th Cir. 2000) (citing Grogan v. Garner, 498 U.S. 279, 291 (1991)); Ojeda v. Goldberg, 599 F.3d 712 (7th Cir. Mar. 25, 2010). Section 523(a)(2)(A) lists three separate grounds for dischargeability: actual fraud, false pretenses, and a false representation. Bletnitsky v. Jairath (In re Jairath), 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001). To sustain a claim under Section 523(a)(2)(A) based on false representation, a creditor must show that "(1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied." Ojeda, 599 F.3d at 716-17. To prevail on a Section 523(a)(2)(A) complaint, all three elements must be established. Glucona Am., Inc. v. Ardisson (In re Ardisson), 272 B.R. 346, 357 (Bankr. N.D. Ill. 2001). Failure to establish any one fact is outcome determinative. Jairath, 259 B.R. at 314. "Justifiable reliance is a less demanding standard than reasonable reliance; it requires only

that the creditor did not 'blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" Id., 599 F.3d at 717 (citing Field v. Mans, 516 U.S. 59, 71 (1995)). It is a subjective, not an objective, standard, but a "creditor has no duty to investigate unless the falsity of the representation would have been readily apparent." Id.

The Plaintiff has failed to meet its burden of demonstrating that the outstanding balance owed to it for the purchased cars is non-dischargeable, first, because it has not proven that the Defendant made a false misrepresentation upon which it justifiably relied, and second, because even if there were such a misrepresentation, the debt owed was not for money, property, services or credit obtained by the representation.

### B.     No Proof of Misrepresentation

The Plaintiff has failed to prove by the preponderance of the evidence that the Debtor made a false misrepresentation. Under 7th Circuit precedent, a bad check by itself is not enough to support a claim under Section 523(a)(2). As Judge Schmetterer stated in New Austin Roosevelt Currency Exch., Inc. v. Sanchez (In re Sanchez), "the utterance of a bad check, without more, is insufficient to show a false misrepresentation ... because a check is not a 'statement'; rather, it is ... a mere promise to pay money in the future either to the drawee or a holder, if the check is dishonored." 277 B.R. 904, 908 (Bankr. N.D. Ill. 2002) (citing Williams v. United States, 458 U.S. 279, 284, 102 S. Ct. 3088 (1982)); see also, e.g., Goldberg Sec., Inc. v. Scarlata (In re Scarlata), 979 F. 2d 521, 525 (7th Cir. 1992) (agreeing with district court that tendering check for which debtor did not have assets

did not constitute a "false pretense" for purposes of Section 523(a)(2)(A)); Banner Oil Co. v. Bryson (In re Bryson), 187 B.R. 939, 960 (Bankr. N.D. Ill. 1995) (Schmetterer, J.) (holding that "as a matter of law, in the absence of a positive statement regarding the sufficiency of the bank account, Bryson's issuance of the checks to Banner does not constitute a false pretense or false representation within the meaning of § 523(a)(2)(A)."). Therefore, the two checks by themselves could not constitute a false representation for purposes of Section 523(a)(2)(A).

However, the Plaintiff argues that Mr. Goldstein made additional affirmative statements that bring his actions within the scope of Section 523(a)(2)(A). See, e.g., Zamora v. Jacobs (In re Jacobs), 403 B.R. 565, 574 (Bankr. N.D. Ill. 2009) (Sonderby, J.) (acknowledging that passing a bad check in itself did not constitute a fraudulent misrepresentation, but that "additional circumstances surrounding the NSF checks," such as repeated statements that debtor "would make good on the checks" brought "the allegations within the realm of a section 523(a)(2) misrepresentation."). The main problem with this argument is that the Court does not believe the testimony presented on this point. The Plaintiff alleged that both times Mr. Goldstein brought in the NSF checks, the sales manager, Chad Anderson, asked Mr. Goldstein if the check would clear, and he answered, "Yes." Both Mr. Anderson and Linda Paton, the office manager, testified to this. However, Mr. Goldstein testified that, while he believed Mr. Anderson might have been in the building at the two times he came with payment, he only spoke with Ms. Paton when he dropped off the checks, and denied that he had made any representations about whether the checks would clear. Ms. Paton also sounded unsure in her testimony, stating "when this check was presented, I believe Chad Anderson asked him if the check would clear and he said it would." (Tr. 19:7-9) (emphasis added). But the larger reason

that the Court is skeptical of the testimony on the point is that both Mr. Anderson and Ms. Paton were so fervent in their testimony about what a good client Mr. Goldstein was before the two checks. When Mr. Anderson was asked whether he had "any concerns as of the date that check was tendered whether or not it would clear," he answered "no." (Tr. 48:3-5). He further stated that "I have never had any problems securing funds [from Mr. Goldstein] in the past. There was no reason to question whether it would clear." (Tr. 48:8-10). He went on to note that Mr. Goldstein "had never lied to me in the past so I did not have any reason to believe that they would not clear." (Tr. 48:15-17). Similarly, when Ms. Paton was asked if she believed at the time the check would clear, she answered that she did, "Because his checks would be good. Whenever he would give us a check, his checks always cleared." (Tr. 21:3-6). They also testified about how often and for how many years he had bought cars through their auction, and how they bent their rules to allow him to pay much beyond the 7 day period they imposed on other customers. None of such testimony is consistent with the proposition that Mr. Anderson suddenly asked Mr. Goldstein whether a particular check would clear. Neither Mr. Anderson nor Ms. Paton indicated that it was their normal practice to ask customers paying by check if the check would clear.

When pressed on cross-examination, Mr. Anderson testified that he asked because he felt a little uneasy that Mr. Goldstein had some accounts that were more aged than usual. However, he also testified that the amount outstanding was not unusual for Mr. Goldstein, that the amount of each check was not unusual for Mr. Goldstein, and while one or two cars purchases were slightly over 60 days old, most were within the 30-day range that was customary for Mr. Goldstein. Moreover, if Mr. Anderson was so concerned about age or amount, it was unusual that he did not ask Mr. Goldstein

Page 8 of 15

to pay off the oldest purchases first or ask him to pay off all outstanding amounts. Also, if it was his concern about the aged receivables that prompted the alleged statement, it is unclear why he would have asked about the second check, too. At the time Mr. Goldstein delivered the second check, the auction had not been notified that the first check bounced. It seems odd that Mr. Anderson would have been concerned when, in his mind, Mr. Goldstein had recently paid off a number of vehicles and was now voluntarily paying off additional ones. It is more likely that Mr. Anderson and Ms. Paton misremembered what was said. Laypersons are likely to think of a check as some sort of promise to pay or representation about ability to pay, and the witnesses may have converted what they thought was an implied statement into an express statement in their minds. But, in light of the Debtor's contradictory testimony on the point, the Court believes that no affirmative representations were made at the time Mr. Goldstein delivered the two checks.[1] The Plaintiff has therefore failed to prove that the Debtor made a fraudulent misrepresentation.

---

[1] Because the Court finds that the Plaintiff failed to prove as a factual matter that any misrepresentation was made, the Court need not decide whether a simple oral statement that a check "is good" or "will clear" on one or two occasions is sufficient to support a Section 523(a)(2)(A) claim. See, e.g., In re Bryson, 187 B.R. at 960 ("[E]ven if the checks constituted a representation as to the solvency of K-C or as to the amount of money in K-C's account [Section 523(a)(2)(A)], by its terms, does not apply to false pretenses, false representations, or actual fraud respecting an insider's or the debtor's own financial condition."). Nor has the Plaintiff demonstrated that the checks, which were an isolated incident in the parties' three-year relationship, were part of an actual fraudulent scheme by the Debtor. See, e.g., Consumers Coop. Credit Union v. Munson (In re Munson), No 10-A-00218, 2010 WL 3768017, at *5 (Bankr. N.D. Ill. Sept. 17, 2010) ("Whether or not the fraud involves a misrepresentation, it must be actual fraud. It does not include constructive fraud [and] the focus must be on the debtor's subjective state of mind at the time of the alleged fraudulent conduct....") (citing In re Demopoulos, 2008 WL 4489153, at *8 (Bankr. N.D. Ill. Sept. 23, 2008)). While the Plaintiff argued he should have known better, Mr. Goldstein testified that he was unaware that there were insufficient funds in the account when he wrote the checks. Furthermore, when he learned the checks had bounced, it seems he almost immediately returned the cars he still had in his possession upon request. It therefore seems unlikely that he intended to permanently evade payment for the cars, either when he initially purchased them or when he delivered the checks. See, e.g., In re Munson, 2010 WL 3768017, at *4 (finding that a "significant subsequent performance seems inconsistent with an intention, at the time the [loan] was entered into, not to perform").

### C.     Debt was not for Money, Property, Services or Credit Obtained through Misrepresentation

Additionally, even if the bad checks somehow constituted a false misrepresentation or actual fraud under Section 523(a)(2), the debt that the Plaintiff seeks to find nondischargeable is the purchase price for the automobiles, and the Debtor did not obtain the *automobiles* through the checks. He had received the cars weeks earlier, at the end of each auction. The Plaintiff tries to argue either that the cars were not actually sold or transferred until the certificates of title were delivered, which Greater Rockford released in reliance on the checks, or that the certificates of title constituted the 'property obtained' for purposes of Section 523(a)(2). However, neither argument is supported by the facts or Illinois law.

> The Illinois Certificate of Title statute provides that:
>
> Except as provided in Section 3-113 and as between the parties, a transfer by an owner is not effective until the provisions of this Section and Section 3-115 have been complied with; however, an owner who has delivered possession of the vehicle to the transferee and has complied with the provisions of this Section and Section 3-115 requiring action by him as [sic] not liable as owner for any damages thereafter resulting from operation of the vehicle.

625 ILCS 5/3-112(e). While at first glance, the statute seems to provide that ownership of a vehicle can only be transferred through the process set forth in sections 3-112 and 3-115 of the statute, which requires execution of an assignment on the face of the certificate of title and delivery of the certificate to the Secretary of State with an application for a new certificate, there is an exception and different process when the transfer is to or from a dealer. Under Section 3-113:

> After a dealer buys a vehicle and holds it for resale, the dealer must procure the certificate of title from the owner or the lienholder. The dealer may hold the

> certificate until he or she transfers the vehicle to another person. Upon transferring the vehicle to another person, the dealer shall promptly and within 20 days execute the assignment and warranty of title by a dealer, showing the names and addresses of the transferee and of any lienholder holding a security interest created or reserved at the time of the resale, in the spaces provided therefor on the certificate or as the Secretary of State prescribes, and mail or deliver the certificate to the Secretary of State with the transferee's application for a new certificate....

625 ILCS 5/3-113(a). The consequence of not complying with the provisions of 3-113 when reselling to a third party is that the dealer would be guilty of a petty offense under 625 ILCS 5/3-113(c).

Therefore, Mr. Goldstein, as a dealer buying vehicles for resale, was required by the statute to procure the certificate of title sometime after buying the vehicles but soon enough to execute an assignment and deliver such certificate of title within 20 days after reselling the vehicles to any third parties. The fact that he did not receive certificates of title when he took possession of the vehicles therefore limited his ability to resell them, but under Section 3-113, the sale to Mr. Goldstein at the auction could have been effective even without his receiving the certificate of title, and even as between the parties.[2] Illinois case law holds that, where possession is transferred on one date and payment and delivery of a certificate of title are made on a later date, the parties' intent governs when the sale and transfer of ownership take place. In <u>Libertyville Toyota v. U.S. Bank</u>, the court found that, where the purchase contracts did not indicate that ownership would transfer only upon payment,

---

[2] It is not entirely clear that Greater Rockford had the right to refuse delivery of the certificate of title, at least if the vehicles were used vehicles. Under 625 ILCS 5/3-115(c), a "transferor of a vehicle, other than a dealer transferring a new vehicle, shall deliver to the transferee <u>at the time of the delivery of possession of the vehicle</u> the properly assigned certificate of title of this vehicle." (emphasis added). However, Section 3-112 and Illinois case law make clear that Greater Rockford's failing to deliver the certificate of title to Mr. Goldstein, a dealer, did not affect the passage of ownership. <u>See e.g.</u> <u>Clay v. Harris</u>, 228 Ill. App. 3d 475, 592 N.E.2d 1154 (Ill. App. Ct. 1992) (finding that an auction's failure to deliver certificate of title within a reasonable time after delivering possession of the vehicle gave *purchaser* a right to rescind the purchase).

and where it was the custom between the dealership/seller and the leasing company/buyer for the dealership to deliver possession of the vehicle but not require payment for 45 days, the parties intended the sale as a "credit sale" and ownership was transferred on the date of possession of the vehicle, even though the certificate of title was never delivered. 371 Ill. App. 3d 1009, 1014, 864 N.E.2d 850, 854-55 (Ill. App. Ct. 2007).

Here, neither the Plaintiff nor the Defendant has submitted any form of written contract as evidence. But, from the testimony and exhibits presented at trial, the Court finds that the parties intended the auctions to constitute credit sales, and that ownership passed to Mr. Goldstein on the date of the auction and when he took possession of the vehicles, even though the certificates of title were not delivered until weeks later when Mr. Goldstein delivered the checks. For example, at trial, Greater Rockford's office manager, Linda Paton, testified as to the business records she prepared and maintained for the auction. She noted that the "sale date" for each vehicle, as noted in their records, was the date of the auction, even in situations where the auction house did not have a certificate of title from the seller at the time of the auction. (Tr. 14:16-24). She testified that all purchasers at the auction could take immediate possession of the vehicles they purchased at the end of the auction, even though payment was not due until later. (Tr. 7:5-16). She also testified that they kept the titles until payment not because they did not believe that ownership had been transferred, but because doing so decreased the likelihood that the purchasers would resell the vehicles to third parties before paying the auction. (Tr. 7:17-23). Finally, Ms. Paton testified that the auction paid the purchase price (less its commission) to the seller of vehicles when the seller delivered the certificate of title to the

auction, even though the auction did not receive payment from the purchaser until later. (Tr. 16:6-13).

Because the Court finds that ownership of the vehicles was transferred to Mr. Goldstein on the date of the relevant auctions, the Plaintiff has not demonstrated a nexus between the debt and the purported misrepresentation. Section 523(a)(2) requires not only a misrepresentation, but that "through the misrepresentation the debtor have 'obtained' either 'money, property, services, or an extension, renewal or refinancing of credit." Bednarsz v. Brzakala (In re Brzakala), 305 B.R. 705, 710 (Bankr. N.D. Ill. 2004) (finding that a misrepresentation made in connection with the payment of an existing, prior debt could not support a Section 523(a)(2)(A) claim). The vehicles could not have been 'property' 'obtained by' the purported misrepresentations, since the checks were delivered weeks after Greater Rockford transferred possession and ownership of the vehicles to Mr. Goldstein. Nor did Greater Rockford 'extend, renew or refinance credit' in reliance on the checks. An agreement to extend the terms of financing or to forebear from collection efforts could have given rise to a 523(a)(2) complaint. Id. at 711. But, the Plaintiff has not alleged or offered evidence that Greater Rockford agreed to do anything other than turn over the certificates of title in reliance on the two checks.

Nor does the certificate of title by itself constitute 'property' for purposes of Section 523(a)(2). Exceptions to discharge "are confined to those plainly expressed in the Code ... and are narrowly construed in favor of the debtor." In re Chambers, 348 F.3d 650, 654 (7th Cir. 2003) (internal citation omitted). Under such a narrow construction, the Court does not believe that, in light of the nature of Illinois' system of certificates of title, a certificate of title, independent of the

vehicle whose ownership it evidences, constitutes "property" for purposes of Section 523(a)(2). For example, the Illinois statute states that a "certificate of title for a vehicle is not subject to garnishment, attachment, execution or other judicial process, but this subsection does not prevent a lawful levy upon the vehicle." 625 ILCS 5/3-107(d). The statute also does not set forth a system whereby certificates of title are transferable between individuals. Instead, when a vehicle is transferred the old certificate of title and an application for a new certificate of title must be sent to the Secretary of State. See, e.g., 625 ILCS 5/3-112. The Illinois certificate of title statute creates obligations for vehicle owners, sellers and purchasers to maintain documents and send documents and fees to the Secretary of State, but the Court does not believe the statutory scheme creates a form of property interest in a certificate of title itself, separate from the vehicle, at least for purposes of Section 523(a)(2).[3]

Since ownership of the vehicles was transferred weeks before the checks were delivered, and the Plaintiff has identified no other "property," "services" or "credit" that the Debtor obtained through the checks, the Plaintiff has not stated or supported a claim under Section 523(a)(2).

## CONCLUSION

For the foregoing reasons, the Court will enter judgment in favor of the Defendant.

---

[3] Even if the Court were to accept the Plaintiff's argument that the receipt of the certificates of title should support a Section 523(a)(2)(A) claim because the Debtor was able to resell the vehicles by receiving the certificates, the damage caused by such receipt would only be related to the losses for the vehicles that Mr. Goldstein was actually able to sell. However, only about half of the damages sought by the Plaintiff relate to vehicles which Mr. Goldstein sold to third parties. The remainder of the damages stems from losses suffered by the Plaintiff in respect of the vehicles for which they were able to regain possession.

THEREFORE, IT IS ORDERED that

the foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021 giving effect to the determinations reached herein.

DATE: December 14, 2010

The Honorable Manuel Barbosa

United States Bankruptcy Judge

## CERTIFICATE OF MAILING

      The undersigned hereby certifies that the attached Memorandum Opinion has been served via First Class Mail on December 16, 2010 to the following:

Jack D. Ward
Michael G. Schultz
Scott A. Calkins
Reno & Zahm, LLP
2902 McFarland Road
Suite 400
Rockford, IL 61107

Timothy C. Culbertson
Law Offices of Timothy C. Culbertson
540 West Colfax Street
Suite 2
Palatine, IL 60067

Kimberly Conrad, Judicial Secretary